Tracey Kitzman (TK 5869)
Dean M. Solomon (DS 3699)
**FRIEDMAN LAW GROUP LLP**
270 Lafayette Street
New York, New York 10012
(212) 680-5150

Brad R. Newberg
**NEWBERG & WINTERS LLP**
12005 Creekbend Dr.
Reston, VA 20194
(703) 772-6787
*Application for Admission
Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DON MOODY, GARY FRIEDMAN,
and WORD WORLD, L.L.C.,

                Plaintiffs,

- against -

KYLE MORRIS, RICHARD P. HAVENS,
SHARING WORLD ENTERTAINMENT, LLC,
and READSPEAK, INC.,

                Defendants.
------------------------------------------------------------x

Case No. _____

**ECF CASE**

**COMPLAINT FOR
DECLARATORY JUDGMENT**

Plaintiffs Don Moody ("Moody"), Gary Friedman ("Friedman"), and Word World, L.L.C. ("Word World") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby bring this Complaint for a Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against Defendants Kyle Morris ("Morris"), Richie Havens ("Havens"), Sharing World Entertainment, LLC ("Sharing World"), and ReadSpeak, Inc. ("ReadSpeak") (collectively, "Defendants"):

1

## INTRODUCTION

1. The *Word World* television show (*"Word World"*) is a highly acclaimed, Emmy® Award-winning children's program broadcast nationally on PBS. It has taken the last five and one-half years, and the tireless contribution of hundreds of people, to develop and produce the innovative *Word World* educational program, websites and products. The founders of Word World, including Moody and Friedman, worked for much of that time without pay. Even today, with hard-won grant moneys from the U.S. Department of Education funding a significant portion of the production, senior executives have often had to defer compensation to allow the company to continue its groundbreaking efforts.

2. Havens and Morris are former business partners of Moody and Friedman. Their venture together terminated in 2002. Shortly after it failed, Moody and Friedman founded the separate company, Word World LLC.

3. Now, more than six years after Havens, Morris, Friedman, Moody and others executed a binding Separation Agreement that specifically contemplated and allowed Moody and Friedman to engage in creative projects such as *Word World*, and after six years with essentially no contact between the parties and not a hint of a complaint by Morris, Havens or the other Defendants (the "Morris/Havens Group"), the Morris/Havens Group has come out of the woodworks with a specious claim that they somehow "own" the raw idea upon which *Word World* is based.

4. Word World and its principals have never been contacted by the Morris/Havens Group or any of their representatives regarding any such claims. Instead, Word World learned about the Morris/Havens Group's claims from its television

2

distributors and co-producers, who were contacted in a transparent bid to disrupt Word World's business.

5. On August 12, 2008, the lawyer for the Morris/Havens Group, Roger L. Fidler, wrote Plaintiffs' production partners, Windows to the World Communications, Inc. ("WTTW," the PBS member station in Chicago), and PBS itself, sending them an intemperate screed of a letter (the "Fidler Letter") and attaching a sixteen-count, 29-page draft Complaint, which asks for $300 million in damages (the "Draft Complaint"). (A true and correct copy of the Fidler Letter and Draft Complaint are appended hereto as Exhibit 1.) The vicious nature of the Fidler Letter is striking. While Fidler, who has never had any communications with any of the Plaintiffs ever, states that he has not been able to fully investigate his clients' assumptions, he accuses Moody and Friedman of criminal wrongdoing and uses the following words to describe them: "duplicitous individual"; "steals"; "lie"; "crass"; "pathetic". He even suggests that Friedman, an attorney, should be disbarred. (It should be noted that as part of the Separation Agreement, the Morris/Havens Group specifically agreed not to make any disparaging statements against Moody or Friedman, and vice versa.) In his Letter, Fidler states that if he does not hear from PBS and WTTW in five days, he will file the Draft Complaint naming PBS and WTTW as defendants.

6. As set forth below in this Declaratory Judgment Complaint, Defendants' Draft Complaint contains a kitchen-sink of baseless, contractually released, federally preempted, and time-barred claims, including a transparently false patent infringement claim. It is absolutely clear that each and every one of the Morris/Havens Group's claims can be and should be summarily resolved on the papers under Fed. R. Civ. P. 12.

7. The Fidler Letter and Draft complaint are interfering with Word World's ability to do business, including Word World's ability to get financing and to do business with its customers and partners, such as PBS and WTTW. Word World cannot well proceed with its business with Defendants contacting Plaintiffs' customers, making patent infringement and other claims challenging their right to do business. The very point of the Draft Complaint is to impede Word World's ability to do business. The only way for Word World to challenge the Morris/Havens Group's claims is through the instant action for a declaratory judgment.

## THE PARTIES

8. Plaintiff Don Moody is a person residing in Rockland County, New York.

9. Plaintiff Gary Friedman is a person residing in New York County, New York.

10. Plaintiff Word World, L.L.C. is a New York limited liability company having its principal place of business at 265 Canal Street, 2nd Floor, New York, NY 10013.

11. Defendant Kyle Morris is a person residing at 900 West End Avenue, New York, New York.

12. Upon information and belief, Defendant Richard P. Havens is a person residing in Jersey City, New Jersey.

13. Defendant Sharing World Entertainment, L.L.C. is a New York limited liability company having its principal place of business at 900 West End Avenue, New York, New York.

14.     Defendant ReadSpeak, Inc. is a New York corporation having its principal place of business at 7 Audubon Place, New Orleans, LA 70118.

## JURISDICTION & VENUE

15.     This case arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.; the Copyright Act, 17 U.S.C. § 101 et seq.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the laws of the State of New York.

16.     This case for declaratory judgment presents an actual controversy within the meaning of 28 U.S.C. § 2201.

17.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

18.     Venue in this Court is proper under 28 U.S.C. § 1391, because Defendants are subject to personal jurisdiction in this District, and because a substantial part of the events giving rise to the claims herein occurred in this District. Furthermore, the Draft Complaint sent by Defendants anticipated that the venue for these issues would be this District.

## FACTUAL BACKGROUND

### Inception Of The Relationships

19.     In or around 1999, Friedman, an attorney, was engaged by ReadSpeak to bring an action against a company, Twin Faces Inc. ("Twin Faces"), which claimed to own the rights to an invention referred to as "ReadSpeak Captions," or "Action Captions." Unlike the captions that most people may be familiar with (a textual typed box at the top or bottom of the TV screen showing what is being said in a program), with

ReadSpeak Captions, words appear on a TV or other audio-visual screen one word at a time, *adjacent to the head of the person speaking those words*, with each such word corresponding to the utterance. In an action before Judge Cote of this Court, Friedman and ReadSpeak argued that ReadSpeak owned the patent covering the ReadSpeak Captions, and that Twin Faces had not in fact acquired rights to use the patent, as it alleged. ReadSpeak obtained a TRO and Preliminary Injunction, and the action quickly settled.

20. Subsequent to the Twin Faces matter, Friedman and ReadSpeak co-founder and director Morris decided to form a company with the intention of obtaining a license from ReadSpeak to use the ReadSpeak Captions and apply them to original programming. They agreed to focus the initial such production around Morris's friend, musician Richie Havens, with Morris directing. Friedman raised capital to finance the venture.

21. At the time Friedman and Morris sought their license, ReadSpeak – founded in 1993 – had yet to earn any money from the ReadSpeak Caption invention. ReadSpeak granted the license, which was its first license ever. Morris, Friedman and Havens then formed a corporation with the sole purpose of commercializing the licensed ReadSpeak captioning technology, naming the new company Playgroundz Productions, Inc. ("PPI").

22. Morris subsequently introduced Friedman and Havens to Plaintiff Moody, a former advertising executive and visual artist with a background in television production, to operate the business.

23. In or around 2001, after having produced some music videos of Havens singing Mother Goose songs with ReadSpeak Captions, PPI shot a pilot for a television show entitled *Mister Word Wizard* starring Havens and using ReadSpeak Captions.

24. By the summer of 2001, if not earlier, Friedman had submitted a memorandum to the ReadSpeak Board resigning as outside counsel and Secretary to the Board. Friedman explained that he had agreed to accept a full time position with PPI, and that he anticipated taking at least two years off from his law practice.

25. By late 2001, the principals of PPI had begun to argue about creative and business differences. Among other things, Morris and Havens complained that Moody excluded them from the planning process for a revamped pilot, which was shot at the end of 2001. Morris also complained that Friedman and Moody had taken steps, without his knowledge, to develop toys that integrate words into physical structures, such as tiles, planks or plush representations of the letters D, O, and G, drawn or formed in such a way that when the letters come together they form a representation of a dog, as well as the word "dog" (the "<u>Word-As-Art Concept</u>"). None of the toys developed by Friedman and Moody used the ReadSpeak captioning technology in any way; rather, Morris was upset that he was not included in the planning and development of this separate product.

**The Separation Agreement & Termination**

26. By the end of 2001, the parties had begun to negotiate a separation agreement. Havens and Morris were represented by experienced intellectual property counsel, Michael Lesser, Esq., who had represented Havens in his professional musical career.

27. Negotiations regarding the agreement went back and forth and dragged on until May 22, 2002, when the parties finally executed an agreement (the "Separation Agreement"). Under the Separation Agreement, Friedman and Moody retained ownership of PPI and its license with ReadSpeak. Morris and Havens divested themselves of all interests in PPI, but received the rights to the *Mister Word Wizard* television show, subject to certain exclusions. (A true and correct copy of the Separation Agreement is appended hereto as Exhibit 2.)

28. Critically, Paragraph 3(g) of the Separation Agreement provides that nothing in the Agreement "**shall be construed to prevent either party from developing or selling any product or property that integrates words or letters into any physical structure** (e.g., tiles or planks)." (Ex. 2 at 3 (emphasis added).) The clear intent and plain meaning of this provision was to ensure that Morris's acquisition of rights to the *Mister Word Wizard* TV show did not abridge the ability of PPI, Moody and Friedman to develop and market toys and television properties that revolve around the Word-As-Art Concept of integrating words into physical structures, such as the D-O-G example above in ¶ 25.

29. The Separation Agreement further contained: a broad general release; a merger clause; a representation that Morris and Havens "affirm they have consulted counsel of their choice regarding this Agreement;" a representation that "in entering into this Agreement, no party has relied upon the oral statement of any other person;" and a recitation that no provision "shall be construed against any party on the grounds that he or it was the primary drafter thereof."

30. The Separation Agreement also obligated PPI to get the approval of ReadSpeak before producing anything other than *Mister Word Wizard* under the ReadSpeak license. Consequently, Friedman and PPI President Peter Schneider ("Schneider") met with ReadSpeak's then CEO John Ranck ("Ranck") and President Joe Koster ("Koster") at the Pershing Square Restaurant on 42nd Street, New York, NY, some months after the Separation Agreement, and demonstrated for them plush toys that Schneider and Moody had produced in China, all of which revolved around the Word-As-Art Concept of integrating words into physical structures, such as the D-O-G example above in ¶ 25. Friedman inquired whether ReadSpeak wanted to license its "Action Captions" to a new venture, in which the ReadSpeak Captions would be used with young actors, and would prominently feature the new Word-As-Art Concept toys. Ranck and Koster declined to enter into the new venture or extend the old license without a cash payment, but both men expressly wished Friedman and Schneider luck in their venture marketing the toys, both in person and subsequently by email.

31. As the Word-As-Art Concept toys did not involve ReadSpeak Captions in any way, neither Mr. Ranck nor Mr. Koster ever remotely suggested that the toys represented any sort of infringement upon ReadSpeak's intellectual property rights, and indeed any such assertion would be flatly contradictory to their statements.

**Word World**

32. In or around October 2002, Friedman, Moody, Schneider, PPI and a group of new investors formed Word World to create intellectual property, including a television program and related merchandise, revolving around the Word-As-Art Concept of integrating words into physical structures, such as the D-O-G example above in ¶ 25.

33.     During the course of the intervening six years, Moody and others worked diligently – and often without any cash compensation – to develop the Word World intellectual property. Their efforts, and the basic idea of the Word World Word-As-Art Concept, were open and notorious. Among other things: (a) in 2005, Word World and others won a highly publicized grant from the United States Department of Education to develop the *Word World* television show (*see* Current Magazine, Aug. 29, 2005, http://www.current.org/education/ed0516rtl.shtml); (b) in May 2004, Word World filed its own patent application covering, *inter alia*, the process whereby words morph into the thing they represent in certain specific product applications; and (c) in February 2004, the popular CNBC television program "Squawk Box" ran an extended feature on *Word World*, demonstrating video clips of the forthcoming television show, and the Word-As-Art Concept toys (such as the D-O-G toy). Word World also presented at leading toy fairs and licensing shows beginning in 2003.

34.     In September 2007, the *Word World* television show aired on PBS television stations nationwide. Produced by Word World LLC and WTTW, the *Word World* TV show has been on air daily since that time with over 97% carriage by the PBS member stations in U.S. markets. In 2008, the show won an Emmy® Award for its groundbreaking lead-in sequence. The show has won scores of awards, including three Parents' Choice Awards for its television programming and home videos, a Preferred Choice award for its plush toys, and a Best in Class award by the Interactive Media Counsel for its Website. *Word World* has garnered innumerable accolades for its educational innovations including, among others an A- rating by Entertainment Weekly, a "Surefire Hit" rating by Cookie Magazine, and 4 out of 5 stars on iVillage.

35. Examples of the audio-visual content of *Word World* are viewable at: www.pbskids.org/wordworld. Examples of Word World's Word-As-Art Concept merchandise are viewable at www.target.com/WordWorld.

36. Word World has never – in any way, shape or form – made use of ReadSpeak Captions in any of its productions, products or otherwise.

**Havens And Morris's Vicious Disparagement Campaign**

37. In the years since the May 22, 2002 Separation Agreement, neither Friedman nor Moody nor any employee or director of Word World has had any contact with Morris or Havens (with one inconsequential exception not relevant here).

38. On August 12, 2008, an attorney named Roger L. Fidler wrote the Letter to WTTW in Chicago, with a copy to the legal department at PBS, along with Havens and Morris. Mr. Fidler claimed to be writing "per the wishes of Richie Havens." (*See* Ex. 1, Fidler Letter, at 1.)

39. In the Fidler Letter, Mr. Fidler alleges that Friedman, Moody and others "unlawfully misappropriated" the intellectual property on which *Word World* is based. He also accused Moody of repeatedly lying, and Friedman of breaching "obligations of the highest order" to his client, referring to the actions of both men as "crass" and "pathetic."

40. The Fidler Letter also admonishes "Mr. Friedman's cavalier attitude toward his attorney-client responsibilities will be dealt with in several forums I am sure, but please ask him to explain how he could intentionally set out to infringe a patent he once defended and expect to remain a member of the bar." (Ex. 1, Fidler Letter, at 2.)

41.     Attached to the Fidler Letter was the Draft Complaint (annexed hereto together with the Fidler Letter as Exhibit 1.) The Draft Complaint names as defendants Moody, Friedman, Word World and numerous others, including PBS and WTTW. The document contains a veritable kitchen sink full of baseless claims that are time-barred, contractually released, federally preempted, barred by ¶ 3(g) of the Separation Agreement, and devoid of any allegations upon which a valid claim for relief may be founded.

42.     Apparently, Fidler and Morris have run similar games before. The well-known writer Aaron Sorkin was dogged for years by a baseless claim – advanced by Fidler on behalf of Morris – that Mr. Sorkin "stole" the idea for his hit television series *The West Wing* from a manuscript that Morris allegedly co-wrote. Defendants in that case won a motion to dismiss, Morris and Fidler amended the Complaint and defendants won a second motion to dismiss, with the Court finding that Morris did not own a valid copyright in his alleged work. *Morris v. Castle Rock Entert., Inc., et al.*, 246 F. Supp. 2d 290 (S.D.N.Y. 2003).

43.     Strikingly, Havens, Fidler and Morris never once over the years contacted Word World to complain about any of Word World's actions. One would think that if they had even a single valid claim, they would have contacted Word World, especially after going through the trouble of creating the Draft Complaint. Because their sole interest appears to be in disrupting the business of Word World and extorting Word World's business partners, the Morris/Havens Group has directed its missives to the distributors of the Word World television show, in an effort to damage Word World's business and create "hold-up value" for themselves.

**Exigency Of The Relief Sought**

44. The Morris/Havens Group's assertion of the baseless claims contained in the Draft Complaint impede Word World's ability to conduct its business. For all its success, Word World is a start-up. Granted funds are earmarked for production, but like all start-up companies, Word World requires capital to grow. Investors will not invest with clouds of scurrilous accusations hanging over the company's crown jewel assets. Indeed, current financing arrangements have already been jeopardized by the Fidler Letter.

45. Further, if either WTTW or PBS were to discontinue their relationship with Word World based upon the libelous and false claims set forth in the Fidler Letter and Draft Complaint, the result would be catastrophic for Word World, its employees, investors, and the hundreds of people who contribute to producing the television show (not to mention the millions of people who benefit from watching the educational *Word World* program across the U.S. and abroad). Among other things, the inability to raise equity capital will have the catastrophic effect of shutting down production, which will lead to Word World missing contractual production deadlines and ultimately being pulled off the air, which will lead to the loss of licensees and other vendors.

46. In the absence of a prompt declaration that Word World is not infringing upon the patent or other intellectual property rights of ReadSpeak, Morris and related parties, Word World stands to suffer irreparable injury for which there is no adequate remedy at law.

## CLAIM I

## <u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF PATENT</u>

47.     Plaintiffs hereby incorporate by reference and reallege each and every allegation contained in each of the foregoing paragraphs.

48.     The Fidler Letter and Draft Complaint – which threaten an imminent suit alleging patent infringement and other claims – create a reasonable apprehension of suit, and thus, an actual controversy between Plaintiffs and Defendants as required by 28 U.S.C. § 2201.

49.     The patent owned by ReadSpeak, U.S. Patent Number 5,741,136 (the "'136 Patent") is strictly limited to a form of audio-visual *captioning*, in which text emerges *from the mouth* of the speaker in a projectile fashion as words are *spoken*. This is a form of captioning known as ReadSpeak captioning (for a demonstration, see www.readspeak.com.) Other forms of captioning include closed captions (which were developed for the hearing impaired, and are now widely available from cable providers), Karaoke captioning, bubble captions (commonly used on static graphic images such as comics) and so forth.

50.     The '136 Patent *only* relates to word objects that appear *inside the ReadSpeak captioning*. By its terms, the '136 Patent is limited in Claim 1 to a system of word captioning in which "each such word symbol . . . correspond[s] to . . . [a] word utterance . . . [and] appear[s] adjacent to the head of the utterer." (*See* United States Patent: 5,741,136 at 3, a true and correct copy of which is appended hereto as Exhibit 3.)

51.     The Morris/Havens Group bases its patent infringement argument on Claim numbers 15 and 21 of the '136 Patent. (*See* Ex. 1, Draft Complaint, at ¶ 70).

Those provisions relate to: "'*The audio-visual work of Claim 1 in which* the word symbol is a word which mutates into a pictogram of the word' (Claim 15) and '*The audio-visual work of claim 1 in which* such frames have objects thereon and in which the word symbols appear in frames as objects and are subject to the physical laws of other objects in the frames' (Claim 21)." (*See id.* (emphasis added); *accord* Ex. 3, United States Patent: 5,741,136, at 4.)

52. Claims 15 and 21 specifically relate *solely* to the audio-visual work of Claim 1. Accordingly, to the extent Claim 15 or Claim 21 covers word symbols morphing into a pictorial image of the word, they do so *only* within the ReadSpeak captions – i.e., only where "each such word symbol . . . correspond[s] to . . . [a] word utterance . . . [and] appear[s] adjacent to the head of the utterer." There is simply no claim in the '136 Patent that can conceivably be construed to cover the "word-as-object" concept outside of the ReadSpeak Captions. This is especially true given the exact nature of the patent claims. Claims 15 and 21 can only exist in the realm of ReadSpeak *captioning*, as the '136 Patent makes clear.

53. No *Word World* production has ever made use of any captioning whatsoever. There has never been, in *Word World*, any "word symbol . . . corresponding to . . . [a] word utterance . . . [and] appear[ing] adjacent to the head of the utterer." The concept and form of the *Word World* television show, as is obvious to anyone watching the show or from viewing the website, simply does not use ReadSpeak captioning. Accordingly, Word World has never infringed the ReadSpeak '136 Patent.

## CLAIM II

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF COPYRIGHT

54.     Plaintiffs hereby incorporate by reference and reallege each and every allegation contained in each of the foregoing paragraphs.

55.     The Fidler Letter and Draft Complaint expressly threaten a claim for infringement of copyright. Thus, an actual controversy between Plaintiffs and Defendants exists, as required by 28 U.S.C. § 2201.

56.     It is clear that no actionable infringement of copyright is alleged in the Draft Complaint. While the Draft refers to an "Appendix A" that supposedly contains copyrighted works belonging to Morris and Sharing World, and an "Appendix B" that supposedly contains infringing works of Word World, Mr. Fidler did not attach such appendices to the Draft Complaint that he sent to PBS and WTTW (further laying bare the scare tactic motivation behind the Draft Complaint). A review of the facts alleged by Defendants in the fact section of the Draft Complaint reveals only one reference to any "copyrighted" material, and that is in Paragraph 64, where Defendants state that a Word World trademark, "WHERE WORDS COME ALIVE" "came from the copyrighted Morris Bible." However, as 37 C.F.R. § 202.1 and numerous Second Circuit cases make absolutely clear, "words and short phrases such as names, titles, and slogans" are "examples of works not subject to copyright and applications for registration of such works cannot be entertained." Therefore, as with virtually any trademarked slogan, the phrase "WHERE WORDS COME ALIVE" is simply not copyrightable (and as Defendants admit in their Draft Complaint, Word World owns the trademark registration on this phrase, which has never been, and could not be, challenged by Defendants).

57. Nor are any of the other elements of Morris's "show bible" or "scripts" infringed by Word World – and more to the point, none are alleged in the Draft Complaint.

## CLAIM III

## DECLARATORY JUDGMENT OF NO LIABILITY ON ALL OTHER CLAIMS

58. Plaintiffs hereby incorporate by reference and reallege each and every allegation contained in each of the foregoing paragraphs.

59. For the reasons stated above, an actual controversy between Plaintiffs and Defendants exists, as required by 28 U.S.C. § 2201, with respect to all other putative claims for relief alleged in the Draft Complaint (the "Other Putative Claims").

60. Defendants' right to pursue the Other Putative Claims is barred by their inability to sufficiently plead a claim upon which relief can be granted.

61. Defendants' right to pursue the Other Putative Claims is barred by the relevant statutes of limitations for each of the Other Putative Claims.

62. Defendants' right to pursue the Other Putative Claims is preempted by the federal Copyright Act.

63. Defendants' right to pursue the Other Putative Claims is barred by the Separation Agreement executed by a general release running from the Havens/Morris Group to Moody, Friedman, Word World and others.

64. Defendants' right to pursue the Other Putative Claims is barred by ¶ 3(g) of the Separation Agreement.

65. Defendants' right to pursue the Other Putative Claims is barred by the equitable doctrines of laches and unclean hands.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.   A Declaratory Judgment that Plaintiffs have not infringed the '136 Patent;

B.   A Declaratory Judgment that Plaintiffs have not infringed any copyright held by Defendants;

C.   A Declaratory Judgment that Plaintiffs are not liable to Defendants for any of the Other Putative Claims;

D.   An Order enjoining Defendants from asserting any claims against Word World LLC's current or future uses of, or current or future attempts to register, any intellectual property consisting of or incorporating the Word-As-Art Concept;

E.   An Order awarding Plaintiffs its reasonable costs, disbursements, and attorney's fees to the extent permitted by law; and

F.   Such other and further relief as the Court shall deem appropriate.

Dated: New York, NY
       August 28, 2008

FRIEDMAN LAW GROUP LLP

By: _____
    Dean M. Solomon (DS 3699)
    270 Lafayette Street
    New York, New York 10012
    (212) 680-5150

-and-

Brad R. Newberg
**NEWBERG & WINTERS LLP**
12005 Creekbend Dr.
Reston, VA 20194
(703) 772-6787
*Application for Admission*
*Pro Hac Vice Forthcoming*